**\*NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____

SUSAN HAAS, Individually and as
Executrix of Carl Brasmer, and Individual
Heirs of the Estate of CARL BRASMER,

                           Plaintiffs,

               v.

3M COMPANY, *et al.*,

                       Defendants.
_____

Civil Action No. 12-2944 (FLW)

**OPINION**

**WOLFSON, United States District Judge:**

Plaintiff Susan Haas, individually and as executrix of Carl Brasmer, and individual heirs of the estate of Carl Brasmer ("Plaintiffs")[1] initiated this products liability and wrongful death action against, *inter alia*, Defendants Boeing Company ("Boeing"), Goodyear Tire & Rubber Company ("Goodyear"), and General Electric Company ("GE") (collectively, "Defendants").[2] The claims in Plaintiffs' Third Amended Complaint ("TAC") arise out of the alleged injuries, and ensuing death, suffered by Decedent Carl Brasmer ("Decedent" or "Brasmer"), which Plaintiffs contend resulted from Brasmer's exposure to Defendants' asbestos-containing

---

[1] Although in their papers Plaintiffs refer to themselves in the singular, it is clear from reading the pleadings, and the claims being asserted, that Plaintiffs include both Susan Haas, in her capacity as executrix, and the Individual Heirs of Carl Brasmer.

[2] The following parties were previously named as defendants, but have since been dismissed: CBS Corporation, Honeywell International, Inc., Goodrich Corporation, and Northrop-Grumman Corporation. *See* Dkt. Nos. 116, 117. Additionally, Plaintiffs have asserted claims against 3M Corporation ("3M"); although 3M at one point filed its own motion for summary judgment, *see* Dkt. No. 85, it subsequently withdrew the motion, *see* Dkt. No. 92, and has not since filed another motion.

products.[3]   Presently before the Court are motions for summary judgment filed by each of the Defendants, except 3M.   *See supra*, Footnote 2.   For the reasons that follow, the Court GRANTS these Defendants' motions.

## I.   BACKGROUND

The following facts are drawn from the parties' L. Rule 56.1 Statements of Material Facts, and are undisputed unless otherwise noted; additional facts will be set forth as necessary.

Decedent served in the United States Air Force ("USAF") as an aircraft mechanic from approximately 1969 to 1973.   GE Facts, ¶ 1; Boeing Facts, ¶ 3.   During this time, Decedent worked or was stationed at several different military bases; first at Lackland Air Force Base ("AFB") in Lackland, Texas, and Homestead AFB in Homestead, Florida, and then at Da Nang AFB in Vietnam, Webb AFB in Texas, Albuquerque AFB in New Mexico, and several other air bases in Thailand.   Boeing Facts, ¶ 4.   At Homestead AFB, Da Nang AFB, and those airbases in Thailand, Decedent worked as a mechanic with the F-4E Phantom aircraft ("F-4E"), manufactured by Boeing; these F-4E planes were primarily outfitted with a J79 model jet engine that was designed by GE in conjunction with the USAF and United States Navy (the "J79 engine").   Boeing Facts, ¶¶ 5, 16; GE Facts, ¶¶ 2, 4-5.   At Webb AFB, Decedent worked with the T-38 Talon aircraft ("T-38").   Boeing Facts, ¶ 6; GE Facts, ¶ 2.   At each base, Decedent was assigned to work on a specific, single aircraft; however, if necessary, he would provide assistance on other aircraft of the same model.   Boeing Facts, ¶ 7.   In particular, when Decedent was stationed at Da Nang AFB and in Thailand, he worked on a F-4E with serial number 69297.   *Id.*

---

[3]      This Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332; diversity of citizenship exists between Plaintiffs and Defendants, and the amount-in-controversy exceeds $75,000.   In that connection, the parties do not dispute that New Jersey law applies to Plaintiffs' claims.

Decedent's primary responsibilities as a mechanic on these planes required him to perform pre- and post-flight inspections, which included checking fuel levels, checking and changing tires, inspecting and replacing landing gear brakes, inspecting and replacing seals and gaskets, and inspecting engine shielding.   *Id.* at ¶ 8.   In addition, Decedent was responsible for maintaining the aircraft forms and publications, as well as ground support equipment.   Pl. Respon. to Boeing Facts, ¶ 8.   While Decedent was in Thailand, he briefly worked under the supervision of Frederick Deaver ("Mr. Deaver"), who held the position of crew chief; Mr. Deaver only interacted with Decedent directly on two occasions—once when Mr. Deaver reprimanded Decedent for incorrectly connecting the brake safety wires on a F-4E, and another time when Decedent caused aircraft fuel from an F-4E to spill onto the tarmac.   *Id.* at ¶ 10; GE Facts, ¶ 9.   Mr. Deaver never observed Decedent working on or around the engines of an F-4E; indeed Deaver could not identify any instance in which he observed Decedent come into direct contract with a GE product, or any gaskets or clamps associated with the J79 engine.   GE Facts, ¶¶ 11-15.

The F-4E aircraft that Decedent worked on were manufactured by Boeing, in its capacity as a military contractor, and in accordance with detailed specifications required by the USAF. Boeing Facts, ¶¶ 15-16.[4]   Indeed, the USAF asserted extensive control and authority over the specifications of the design and manufacture of the F-4E.   *Id.* at ¶ 18.   In that connection, the United States Government mandated the use of asbestos-containing materials in certain areas of the F-4E.   *Id.* at ¶ 20.   Specifically, in order to meet the Government's requirements, Boeing was required to use asbestos-containing materials in areas that required high temperature and

---

[4]      Plaintiffs dispute whether the F-4E was actually manufactured pursuant to specifications developed by the USAF and/or United States Government, rather than Boeing, but does not dispute that the Government required certain specifications to be met.   *See* Pl. Respon. to Boeing Facts, ¶¶ 15-17.

fluid resistance; failure to adhere to these requirements would render the aircraft nonconforming under the contract and subject to rejection by the Government.   *Id.* at ¶ 21.

In February 2012, Decedent was diagnosed with malignant pleural mesothelioma, and in April 2012, filed this products liability action against Defendants alleging that his mesothelioma was caused by exposure during his time in the USAF to asbestos-containing products manufactured and/or supplied by Defendants.   Goodyear Facts, ¶ 1-2; Boeing Facts, ¶ 1; *see also* Dkt. No. 1-1 (Complaint).   During the course of litigating his claims, Decedent was deposed over three days; however, Decedent passed away before his deposition concluded. Goodyear Facts, ¶¶ 4-5; GE Facts, ¶ 3.   Subsequently, Plaintiffs filed the instant TAC, adding state law wrongful death claims.   *See* Dkt. No. 39 (TAC).   The parties have concluded their fact discovery, with no outstanding discovery demands remaining; thus, Defendants' motions for summary judgment are ripe for resolution by this Court.

## II.   STANDARD OF REVIEW

Courts will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(a).   An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the non-moving party's favor.   *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52.   A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.   *See id.* at 252. In determining whether a genuine issue of material fact exists, the court must view the facts and

all reasonable inferences drawn from those facts "in the light most favorable to the [non-moving] party."   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion."   *Celotex v. Catrett*, 477 U.S. 317, 323 (1986).   The nonmoving party then carries the burden to "designate 'specific facts showing that there is a genuine issue for trial.'"   *Id.* at 324.   Moreover, the non-moving party may not rest upon the mere allegations or denials of its pleading.   *Id.* at 324; *Maidenbaum v. Bally's Park Place, Inc.*, 870 F. Supp. 1254, 1258 (D.N.J. 1994).   The non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts."   *Matsushita*, 475 U.S. at 586.   A mere "scintilla of evidence . . . will be insufficient."   *Anderson*, 477 U.S. at 252.

## III.   DISCUSSION

Boeing has filed a motion for summary judgment on the basis that Plaintiffs' claims against it are barred under the government contractor defense, as established in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 512 (1988), as well as on the basis that Plaintiffs have failed to establish that Decedent was exposed to any asbestos-containing products manufactured and/or supplied by Boeing.   GE and Goodyear also have each filed motions for summary judgment on the basis that Plaintiffs have failed to establish that Decedent was exposed to any asbestos-containing products manufactured and/or supplied by GE or Goodyear.   Although there are issues of fact and law common to all three motions, I address each motion separately in the interest of clarity.

### A. Boeing's Motion for Summary Judgment

Boeing primarily contends that it is immune from state law liability for Plaintiffs' claims because it is entitled to the government contractor defense set forth in *Boyle*, and that Plaintiffs have failed to challenge the defense by raising any genuine dispute on summary judgment. Additionally, Boeing argues that summary judgment should be granted in its favor because Plaintiffs have failed to establish that Decedent's injuries were caused by exposure to asbestos-containing products manufactured and/or supplied by Boeing.

The *Boyle* defense protects a private government contractor from liability on a state law products liability claim "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512. With respect to the first prong of the defense, although a defendant must show that the United States approved reasonably precise specifications, *id.*, it is necessary only that the government approve, rather than create, the specifications. *Carley v. Wheeled Coach*, 991 F.2d 1117, 1125 (3d Cir. 1993) (citing *Koutsoubos v. Boeing Vertol, Div. of Boeing Co.*, 755 F.2d 352 (3d Cir. 1985), *abrogated on other grounds by Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67, 69-70 (3d Cir. 1990)); *see also Maguire*, 912 F.2d at 71-72 (holding that "the government contractor defense is available to a contractor that participates in the design of the product, so long as the government's approval consists of more than a mere rubber stamp" (internal quotation marks omitted)); *Russek v. Unisys Corp.*, 921 F. Supp. 1277, 1288 (D.N.J. 1996) ("Federal appellate courts have generally concluded that the first condition of *Boyle* is satisfied when the government and the contractor engage in a 'continuous back and forth' review

process regarding the design of the product.").   The first prong of the defense also requires that the alleged defect at issue was required by the specifications—*i.e.*, it is not possible to comply with both the specifications and the state-prescribed standard of care that is alleged to be breached. *Russek v. Unisys Corp.*, 921 F. Supp. at 1288 (quoting *Boyle*, 487 U.S. at 509).   Finally, a defendant may alternatively establish the third prong of the defense by showing that the government "knew as much or more than the defendant contractor about the hazards" of the product.   *See Beaver Valley Power Co. v. Nat'l Eng'g & Contracting Co.*, 883 F.2d 1210, 1216 (3d Cir. 1989).

Relying primarily on the testimony of its corporate representative, Richard Shimamoto,[5] Boeing contends that it has provided sufficient evidence supporting all three prongs of the government contractor defense: (i) Boeing designed the F-4E pursuant to reasonably precise specifications approved by the United States, (ii) the F-4E conformed to those specifications, and

---

[5]   Mr. Shimamoto testified that he agreed with the statement that he was "the representative of the Boeing Company with the most knowledge regarding the asbestos-containing materials contained in the F-4[E] between the years . . . '70 and '74."   Boeing Br., Ex. I (hereinafter "Shimamoto Dep."), at T60:16-T61:1.   Mr. Shimamoto further testified that he had been hired by Boeing (at that time, McDonnell Aircraft Company) in 1963, as an engineer, and assigned to the F-4 program, of which the F-4E is a part; he stayed with the F-4 program in various engineering and supervisory capacities continuously until 1999, except for a brief hiatus from the program from 1988 to 1990.   *Id.* at T27:1 to T29:15.   In his work on the F-4 program, Mr. Shimamoto testified that he was involved in the design process—initially associated with the aircraft's electrical wiring, but later expanding to design modifications and writing specifications.   *Id.* at T30:15-T31:10.   With regard to the basis of his knowledge as to any asbestos-containing components in the engine and brake areas of the F-4E, Mr. Shimamoto explained that, in preparing for the deposition, he had reviewed records, specifications, and technical manuals associated with the aircraft, including the "detail specification" for the F-4E. *Id.* at T21:6-T22:13, T33:7-T36:11.   Although not fully explained by Mr. Shimamoto, through his testimony it is apparent that the detail specification includes, at minimum, information detailing the specific parts of the F-4E aircraft and, significantly, whether these parts were included in the specification by Boeing or by the Government's request.   *See* T36:6-T37:8 (describing a part as "GFE, government-furnished equipment . . . [for which] Boeing had no design participation, no manufacturing responsibility, nor did [it] procure" the GFE component); *id.* at T69:12-T70:19 (explaining that government requirement can be identified in the detail specification by use of the word "shall").

(iii) the dangers of asbestos-containing products were readily known to the United States at the time of the development and use of the F-4E.   Plaintiffs, in opposition, challenge the applicability of the government contractor defense on two grounds.   First, Plaintiffs contend that Boeing did not create the F-4E pursuant to specifications provided by the Government.   Second, Plaintiffs argue that the government contractor defense applies only to design defect claims, and not to failure-to-warn claims.    I address these arguments in turn.

Plaintiffs first argue that Boeing is not entitled to the government contractor defense because it has failed to carry its initial burden of establishing the first prong.   In particular, Plaintiffs contend that Boeing's company representative did not testify in deposition that Boeing produced the F-4E pursuant to reasonably precise specifications approved by the United States, but rather that Boeing wrote the detailed specifications for that aircraft.[6]   In other words, Plaintiffs argue that the "specifications were not delineated by the USAF," but by Boeing.   Pl. Resp. to Boeing Facts, ¶ 17.   Although not fully articulated in their opposition papers, Plaintiffs appear to contend that under this description of the F-4E development process, Boeing would not be entitled to the government contractor defense.

In his deposition testimony, Mr. Shimamoto explained the process for developing the F-4E in connection with the United States government:

> **Q:** Who designed and built the [Boeing] F-4[E]?
> . . .
> **A:** We designed, we being Boeing, designed the aircraft.
> **Q:** Okay.   Who built the aircraft?
> . . .

---

[6]     In that connection, Plaintiffs contend that a declaration submitted by Richard Shimamoto in further support of Boeing's motion, dated November 8, 2013, included additional facts not previously testified to by Mr. Shimamoto.   Because I rely solely on Mr. Shimamoto's deposition testimony in determining whether Boeing in entitled to the government contractor defense, and because nothing in Mr. Shimamoto's declaration recants his deposition testimony, I need not reach Plaintiffs' argument's regarding the declaration.

**A:** We assemble[d] the aircraft.   And we did that and we designed the aircraft to meet the requirements of the detail specification.

**Q:** Okay. . . .   The detail specifications are provided by whom?

**A:** We at Boeing wrote the detail specification, but it reflects the requirements and agreements that we made in collaboration with the Air Force, with our customer. So the detail specification, although we wrote it, reflects the requirements, the configurations, and all that information, as I say, as a collaboration between the Air Force and . . . Boeing.

**Q:** . . . Boeing writes the detail specification, is that correct?

**A:** We wrote it, yes.

**Q:** But you incorporate what you're calling requirements of the United States Air Force; am I right so far?

**A:** Yes.

Shimamoto Dep., T:63:8-T65:3.   In that connection, Mr. Shimamoto further agreed that is was his testimony that "wherever there was asbestos on the [F-4E] aircraft or in the aircraft, it would have been specified by the United States Air Force."   *Id.* at T74:12-16.[7]

Notwithstanding the foregoing testimony, Plaintiffs highlight portions of Mr. Shimamoto's deposition in which Mr. Shimamoto explained that he did not know by what specific means the USAF requirements were communicated to Boeing.   For example, Plaintiffs cite the following testimony:

**Q:** How do these [USAF] requirements get transmitted to Boeing?   Are they a document?   Is it in a conversation?   How is that transmitted?
. . .
**A:** I'm not sure.

*Id.* at T65:4-11.  Based on this and similar testimony, Plaintiffs argue that Boeing has not established the first prong of the government contractor defense because Mr. Shimamoto's

---

[7]     Plaintiffs point out that Mr. Shimamoto also testified "I don't know" in response to the question: "why is it that you believe that wherever [asbestos-containing components] appear . . . they only appear there because they were specified to appear there by the United States Air Force?"   Shimamoto Dep., T75:4-14.   I do not find that this response—to a rather confusingly worded question—undermines Mr. Shimamoto's earlier testimony that the reason asbestos appeared on the F-4E was pursuant to the requirements of the USAF.   At most, Mr. Shimamoto's "I don't know" response indicates that he did not know why, with regard to specific locations on the aircraft, the USAF required asbestos-containing products.

testimony shows that (i) Boeing, not the government, drafted the detail specification for the F-4E, and (ii) Mr. Shimamoto could not explain the method of communication by which the USAF requirements were conveyed to Boeing for incorporation into the detail specification, and thus his responses fail to show that the United States approved reasonable precise specifications for the F-4E.   I disagree.

As noted above, courts, including the Third Circuit, have consistently held that the first prong of the government contractor defense does not require the government to draft the specifications.   Instead, it is sufficient for the government to collaborate with the contractor in developing the specifications.   *Carley*, 991 F.2d at 1125.   And, provided that the government's involvement is more than a "rubber stamp," a defendant under these circumstances satisfies the first prong of the *Boyle* test.   *Maguire*, 912 F.2d at 71-72.   Here, Mr. Shimamoto provided repeated, and uncontradicted, deposition testimony explaining that the USAF was intimately involved in the design and development of the F-4E, notwithstanding the fact that Boeing drafted the initial specifications.   Indeed, Mr. Shimamoto explicitly testified that the F-4E specification "reflects the requirements and agreements that we made in collaboration with the Air Force." Shimamoto Dep., T64:8-10; *see also* Boeing Facts, ¶ 18 ("The United States Military asserted extensive control and authority over the specifications of the design and manufacture of the F-4E.") (undisputed by Plaintiffs).   Moreover, I do not find it material that Mr. Shimamoto could not testify as to the exact method that the USAF requirements were conveyed to Boeing in the F-4E development process.   The undisputed testimony is that Boeing created the detailed specification in "collaboration" with the USAF, which is reflected in the detail specification's reference to requirements demanded by the USAF and/or United States government.   *See supra*,

Footnote 5 (referencing Mr. Shimamoto's testimony describing how detail specification reveals government requirements).   For example, Mr. Shimamoto testified at deposition that the F-4E specification "tells [Boeing] that we need to install a J79GE-17 turbojet engine [and] that is a requirement passed on to us by the Air Force."   Shimamoto Dep., T68:13-16.   Plaintiffs have not pointed to any evidence contradicting Mr. Shimamoto's testimony that the F-4E was developed in collaboration with the USAF, and incorporated certain government-supplied requirements.

Accordingly, I am satisfied that there is no dispute that the F-4E specification was developed in collaboration with the USAF, and, because of that, the specification includes requirements provided by the United States.   This is sufficient for Boeing to satisfy the first prong of the government contractor defense.   *Maguire*, 912 F.2d at 72 n.2 ("However, the mere fact that a design proposal originates with the government contractor is not enough to make the defense inapplicable.   In *Boyle*, the Supreme Court explicitly rejected such a course, writing: 'The design ultimately selected may well reflect a significant policy judgment by Government officials whether or not the contractor rather than those officials developed the design.'" (Quoting *Boyle* 487 U.S. at 513.)).   Accordingly, it is insufficient to defeat summary judgment, on the first prong of the government contractor defense, that Mr. Shimamoto could not explain the exact method of communication the USAF used to convey its requirements to Boeing.   *Id.* at 72.   Thus, Boeing has shown its entitlement to the first prong of the government contractor defense.

Plaintiffs do not challenge that Boeing has satisfied the second or third prongs of the *Boyle* test, which, in any event, I find that Boeing has established.   The second prong requires that the F-4E conformed to the specifications approved by the USAF.   Plaintiffs do not dispute the fact that F-4E aircraft was manufactured according to detailed military specifications for which the

United States required compliance.   Boeing Facts, ¶ 16; Pl. Resp. to Boeing Facts, ¶ 16.
Similarly, Plaintiffs do not dispute that any deviation from the F-4E specifications would result in
the aircraft not conforming to the contract and thereby being rejected by the government.   Boeing
Facts, ¶ 21; Pl. Resp. to Boeing Facts, ¶ 21.   This is entirely consistent with Mr. Shimamoto's
uncontradicted deposition testimony that Boeing designed the F-4E to meet the requirements of
the detail specification developed in collaboration with the USAF.   Finally, there certainly is no
dispute in this case that the F-4E was actually developed and produced in accordance with the
specifications, and was then accepted by the government.   Thus I find that Boeing has established
the second prong of the government contractor defense.   *See Carley*, 991 F.2d at 1125 (finding
second prong of *Boyle* satisfied where there was no dispute that product that was required to be
produced according to government specifications was actually accepted and used by government).

With respect to the third prong, Boeing was only required to inform the government of
defects known to Boeing but not known to the government.   Here, Boeing points out, by relying
on cases from several jurisdictions with similar circumstances, that it is well-settled that at the time
of development and production of the F-4E, the government knew as much as Boeing, if not more,
about the dangers of using asbestos-containing products, and thus Boeing had no obligation to
disclose the use of such products.[8]   *See, e.g.*, *Niemann v. McDonnell Douglas Corp.*, 721 F. Supp.
1019, 1028 (S.D. Ill. 1989) ("[A]t the time of the construction of these aircraft [in the 1950s], the
government was aware of the risks of the use of asbestos, and chose to continue to use asbestos in
spite of this knowledge."); *Allen v. Gen. Elec. Co.*, Civ. No. 3:09-CV-372(CFD), 2010 WL

---

[8]     Indeed, according to Mr. Shimamoto's undisputed testimony, Boeing was required by the
government to use asbestos-containing products in certain areas of the aircraft, Shimamoto Dep.,
T74:12-16 and/or had such products furnished to it by the government.   *See id.* at T36:1-21
(testifying that, during the relevant time period, the brakes of the F-4E were supplied as
"government-furnished equipment," in which Boeing had "no design participation, no
manufacturing responsibility"); *see also supra*, Footnote 5.

918305, at *3 (D. Conn. Mar. 9, 2010) (finding that the dangers of asbestos were well known to the United States Navy as early as 1922); *Blackman v. Asbestos Defendants*, Civ. No. C-97-3066, 1997 WL 703773 at *3 (N.D. Cal. Nov. 3, 1997) (noting that a military contractor "is not an asbestos manufacturer; rather [the contractor] manufactures [military aircraft]. [The contractor] had no greater opportunity to know of the dangers of asbestos in the 1970's than did the USAF, and therefore, did not owe a duty to warn the USAF of the asbestos hazards."). More importantly, Plaintiffs do not dispute that the dangers of asbestos were well known in the middle of the twentieth century to the United States government, at least as much as they were known to a contractor like Boeing. On this basis alone, I find that the third prong of the government contractor defense is satisfied because Plaintiffs do not dispute that Boeing was not privy to any unknown danger of asbestos, as used in the F-4E, and thus, was under no obligation to warn the government. *Russek*, 921 F. Supp. at 1291 ("[T]he third prong of Boyle . . . requires disclosure where a manufacturer knows more than a purchasing governmental agency . . . ." (Citing *Boyle*, 487 U.S. at 512.)).

In sum, I find that Boeing has established its entitlement to the government contractor defense under all three prongs set forth in *Boyle*. Plaintiffs have failed to raise any genuine issue of material fact with respect to the first prong, and they do not dispute that Boeing satisfies the second and third prongs. Accordingly, Boeing is not liable for Plaintiffs' state law products liability claims.

I pause to address Plaintiffs' contention that the government contractor defense only extends to shield Boeing from Plaintiffs' design defect claim, but not Plaintiffs' failure to warn claim. Although not significantly developed in their papers, Plaintiffs rely on several cases from

13

outside of this Circuit, primarily *Tate v. Boeing Helicopters*, 55 F.3d 1150, 1156 (6th Cir. 1995), for the proposition that Boeing's government contractor defense does not apply to Plaintiffs' failure to warn claim.   Plaintiffs' reliance on these cases is misplaced for several reasons.   First, none of the cases cited by Plaintiffs, *Tate* included, held that the government contractor defense does not extend to failure to warn claims.   *See Russek v. Unisys Corp.*, 921 F. Supp. at 1292 (noting that "the federal appellate courts that have addressed the issue, [*see, e.g.*, *Tate v. Boeing Helicopters*, 55 F.3d 1150, *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 1003 (7th Cir. 1996), *In re N.Y. Asbestos Litig.*, 897 F.2d 626, 632 (2d Cir. 1990),] however, have all concluded that *Boyle* applies to failure to warn claims").   Thus, contrary to Plaintiffs' contention, the government contractor defense applies to both design defect and failure to warn claims.

In that connection, I note that although the Third Circuit has not ruled on whether the same *Boyle* test applies to failure to warn claims, a case in this District addressed that exact issue in *Russek v. Unisys Corp.*, 921 F. Supp. 1277, and I find the reasoning in *Russek* to be persuasive.   In a thorough and well-reasoned opinion, the *Russek* court found "that a line of cases from the Fifth Circuit involving the government contractor defense and failure to warn claims is [most] instructive" and consistent with the Third Circuit's explanation of *Boyle*.   *Id.* at 1292-93.   In line with those cases, the *Russek* court held that "where the manufacturer has established a *Boyle* defense as to the design defect, and the relevant specifications are silent as to warnings, *Boyle* bars the failure to warn claim as well."   *Id.* at 1292-93.   The *Russek* decision has never been overruled or called into question by the Third Circuit; indeed, other courts have relied on *Russek* for this proposition.   *See, e.g., Houghtailing v. Unisys Corp.*, 955 F. Supp. 309, 314 (D.N.J. 1996).

Moreover, Plaintiffs have offered no basis to question *Russek*'s reasoning, with which I agree .   I will apply the *Russek* standard to Plaintiffs' failure to warn claim.[9]

Here, I have concluded that Boeing has established its entitlement to the government contractor defense for Plaintiffs' design defect claim.   With respect to whether the specifications contain any requirement to warn of the dangers of asbestos products, it is clear, based on Plaintiffs' failure-to-warn allegations, that the F-4E did not contain any warnings, or did not contain adequate warnings, of the hazards associated with asbestos-containing products.   As already noted, however, it is undisputed that the government would not accept the F-4E if it did not conform to the government's specifications.   Thus, the only possible inference to be drawn from these uncontested facts is that the specification was silent as to warnings in this regard; if the specification had required warnings but Boeing failed to include them, then the F-4E would have been nonconforming and the government would not have accepted the product.   Accordingly, I find that there can be no dispute that the specifications were silent as to warnings related to asbestos-containing products; for that reason, under *Russek*, Plaintiffs' failure-to-warn claim is also barred by *Boyle*.[10]

_____

[9]       The cases cited by Plaintiffs, *Tate*, *Oliver*, and *In re N.Y. Asbestos Litig.*, apply a slightly different test than *Russek* for failure to warn claims.   Like the *Russek* court, I find no basis to follow the test set forth in these decisions—which are not binding on this Court—because I conclude that it is inconsistent with the Third Circuit's application of the government contractor defense, as set forth in *Carley*.   *Russek*, 921 F. Supp. at 1292-93.   Indeed, as noted above, Plaintiffs provide no justification for following *Tate* or these other cases over *Russek*.

[10]       Although I need not reach Boeing's other basis for summary judgment, I note that even if Boeing is not entitled to the government contractor defense, it would still prevail on summary judgment due to Plaintiffs' lack of proof of causation, for largely the same reasons explained, *infra*, in connection with GE and Goodyear's motions.   Specifically, Plaintiffs have failed to show that Decedent had any "regular, frequent, and proximate" exposure to any asbestos-containing products in the F-4E—the causation standard for asbestos cases as set forth by New Jersey courts, which is described in more detail *infra*.   Plaintiffs have merely established, principally through the expert report of Mark A. Thompson—which itself is premised on Decedent's generic deposition testimony—that Decedent was "exposed to asbestos

15

**B.  GE's Motion**

GE moves for summary judgment on Plaintiffs' claims on two grounds.  First, GE argues that Plaintiffs have failed to produce evidence that Decedent was exposed to any GE product on the F-4E, *i.e.*, that Decedent ever worked on or around the GE-provided J79 engine on the F-4E.   Second, GE argues that Plaintiffs have failed to demonstrate, as is required under New Jersey law, that he had regular, frequent, and proximate exposure to asbestos from any GE product during his military service.   In connection with both of these arguments, GE rejects Plaintiffs' reliance on Decedent's deposition testimony, contending that the deposition terminated prematurely—due to Decedent's death—and thus neither GE nor any other Defendant had the opportunity to cross-examine Decedent.   According to GE, this testimony is therefore inadmissible under Fed. R. Evid. 801(c) and 804(b)(1), and cannot serve as a basis to defeat summary judgment under Fed. R. Civ. P. 56(c).   In response, Plaintiffs contend that there is ample record evidence, including but not limited to Decedent's deposition testimony, to allow a jury to find that Decedent was exposed to asbestos-containing products manufactured and/or supplied by GE.   Nevertheless, because the strength of Plaintiffs' case relies in large part on Decedent's deposition testimony, I address whether his testimony is properly relied upon to defeat GE's summary judgment motion, prior to addressing the parties' substantive arguments.

As noted previously, once the moving party has shown its entitlement to summary judgment, the nonmoving party carries the burden to "designate 'specific facts showing that there

---

based on the work he was performing around the F-4E aircraft."   Pl. Opp. to GE Mot., Ex. F, ¶ 5.   Plaintiffs put forth no facts showing that Decedent was exposed to any asbestos-containing product manufactured or supplied by Boeing.   Plaintiffs' reliance on Mr. Thompson's vague conclusions are insufficient to defeat Boeing's motion for summary judgment.   *See New Jersey Tpk. Auth. v. PPG Indus., Inc.*, 197 F.3d 96, 112 (3d Cir. 1999) (citing *Anderson*, 477 U.S. at 249-50) (explaining expert opinions that are not sufficiently probative of issue cannot be used to defeat summary judgment).

is a genuine issue for trial,'" and, in doing so, may not rest upon mere allegations or denials of its pleading.   *Celotex v. Catrett*, 477 U.S. at 324.   Furthermore, a party "at the summary judgment stage must set forth evidence as would be admissible at trial, . . . and thus must be reduc[ible] to admissible evidence."   *Williams v. Borough of W. Chester*, 891 F.2d 458, 466 n.12 (3d Cir. 1989) (citations and internal quotation marks omitted) (citing former Fed. R. Civ. P. 56(e) and *Celotex v. Catrett*, 477 U.S. at 327).   Thus, on a motion for summary judgment, the court may consider hearsay evidence only "if the out-of-court declarant could later present that evidence through direct testimony, *i.e.* 'in a form that would be admissible at trial.'" *Id.*; *see also Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co.*, 998 F.2d 1224, 1235 n.9 (3d Cir. 1993) (holding that a hearsay statement can be considered on summary judgment because the nonmoving party "simply has to produce the [declarant] to give . . . testimony").   Indeed, the Third Circuit recently reaffirmed the principle that "[h]earsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment."   *Smith v. Allentown*, 589 F.3d 684, 693 (3d Cir. 2009) (affirming trial court's refusal to consider on summary judgment double hearsay statement offered by plaintiff, where no independent basis existed for admission of statement).

Decedent's deposition testimony is undoubtedly hearsay: it is an out-of-court statement and Plaintiffs are offering it for the truth of the matter asserted.   Fed. R. Evid. 801(c).   I cannot consider this testimony on summary judgment under the normal principle that Plaintiffs could simply present Decedent at trial because Decedent is unavailable.   Thus, Decedent's hearsay testimony may only be considered if it falls within one of the exceptions to hearsay.

The Federal Rules of Evidence permit former testimony, such as the Decedent's deposition testimony, to be admitted under Rule 804(b)(1), provided three criteria are met: (1) the declarant must be unavailable; (2) the testimony must be taken at a hearing, deposition, or civil action or proceeding; and (3) the party against whom the testimony is now offered must have had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. *Kirk v. Raymark Indus., Inc.,* 61 F.3d 147, 164 (3d Cir. 1995) (citing Fed. R. Evid. 804(b)(1)). Under Rule 804(b)(1), the burden is on the proponent of the evidence to satisfy all three criteria, including subsection (b)(1)(B), which requires the proponent "to prove that a defendant in the present case would have had an opportunity and similar motive to cross-examine a witness who was deposed in an earlier action." *Blackburn v. Northrup Grumman Newport News,* MDL 875, 2011 WL 6016092, at *1 n.1 (E.D. Pa. Aug. 31, 2011) (citing *Kirk*, 61 F.3d at 166). In that connection, the Third Circuit has noted that subsection (b)(1)(B) exits to ensure "'that the earlier treatment of the witness is the rough equivalent of what the party against whom the statement is offered would do at trial if the witness were available to be examined by that party.'" *Kirk*, 61 F.3d at 166 (quoting *United States v. Salerno*, 937 F.2d 797, 806 (2d Cir. 1991)); *see also Creamer v. Gen. Teamsters Local Union* 326, 560 F. Supp. 495, 498-99 (D. Del. 1983) ("In order for testimony to be admissible under Rule 804(b)(1) . . . the party against whom the testimony is now offered . . . must have had an 'opportunity and similar motive' in the former proceeding to develop the testimony by cross-examination.").

Here, is it undisputed that Decedent's deposition proceedings terminated prematurely; indeed, Defendants only contend that Decedent's testimony is inadmissible because it does not satisfy the third requirement of Rule 804(b)(1) because they had no opportunity to cross-examine

18

Decedent.   Review of the deposition, which occurred over three days, reveals a different picture.   To begin, counsel for all Defendants were present throughout the deposition, either in person or telephonically, and thus, contrary to GE's contention, this is not the situation in which deposition testimony should be excluded from trial because opposing counsel was not present during the prior testimony.   More importantly, virtually all direct questioning of Decedent over the three days he was deposed was conducted by counsel for Boeing.   *See, e.g.*, Boeing Mot., Ex. F (Deposition of Decedent, dated May 8, 2012) (hereinafter "Decedent Dep. Vol. 1"); *id.* at Ex. G (Deposition of Decedent, dated May 10, 2012) (hereinafter "Decedent Dep. Vol. 3"); *id.* at Ex. H (Deposition of Decedent, dated May 9, 2012) (hereinafter "Decedent Dep. Vol. 2").   Put differently, it appears from the record that counsel for Boeing led the deposition questioning, and counsel for the other Defendants were able to object to questions or answers, or interject their own questions or answers, even though these counsel did have the opportunity to conduct their own examination.   Thus, although Defendants contend that Decedent's deposition testimony should not be relied upon by Plaintiffs in opposing summary judgment because it would not be admissible at trial, that is not so clear on the record before me.

The deposition transcripts show that counsel for Boeing asked numerous questions of Decedent over several days, and elicited from him a significant amount of information pertaining to those questions.   The fact that Boeing's counsel led the deposition questioning, and not counsel for Goodyear or GE, does not alter my analysis.   As noted, it appears that counsel for GE and Goodyear actively participated in the deposition, and thus had some opportunity to develop Decedent's testimony.   Moreover, Boeing certainly had a similar interest and opportunity to develop the testimony as did Goodyear and GE.   The Third Circuit has explained

that the "opportunity and similar motive" requirement of Rule 804(b)(1) is satisfied where there are "interests in law [that] are the claims or demands or desires which human beings, either individually or in groups or associations or relations, seek to satisfy." *Lloyd v. Am. Exp. Lines, Inc.*, 580 F.2d 1179, 1186 (3d Cir. 1978) (citation omitted). Here, all three Defendants moved for summary judgment on common grounds—that Plaintiffs cannot prove that any of Defendants' products caused Decedent's injury—and thus, Boeing unquestionably shared a common interest and motive with Goodyear and GE in developing Decedent's testimony. From the transcript, I cannot say that Boeing, and the other Defendants who were involved in the deposition, lacked the opportunity and motive to develop Decedent's testimony. *See* Fed. R. Evid. 804(b)(1)(B); *see Kirk*, 61 F.3d at 166.[11]

In sum, at this juncture and on this record, it appears, that Defendants, or their party in interest, had an adequate opportunity to develop Decedent's testimony during the deposition and that, therefore, the testimony falls within the exception to hearsay under Rule 804(b)(1). *See Kirk*, 61 F.3d at 166 (explaining that the third prong of Rule 804(b)(1) is satisfied where "the earlier treatment of the witness is the rough equivalent of what the party against whom the statement is offered would do at trial if the witness were available to be examined by that party"

---

[11]    I briefly note that prior to the start of the third day of Decedent's deposition, counsel for Boeing stated on the record an extended objection regarding certain inconsistencies in Decedent's testimony, which appeared to be caused by Decedent's medications, including a lengthy period on the second day where Decedent was deposed after he had been administered Percocet (oxycodone). Counsel for Boeing raised significant concerns and on-the-record objections to the use of Decedent's testimony on the basis of his competency. *See, e.g.* Decedent Dep., Vol. 3, T110:8-T112:14. Following this objection, and clarification that Decedent was not on any strong medications on that third day, the deposition proceeded, with counsel for Boeing leading the direct questioning. Although this objection certainly gives this Court pause, none of Defendants has raised Decedent's testimonial competency as a grounds to exclude his testimony on summary judgment, and, on the limited record before me on that issue, and on this motion, I am unable to determine that Decedent's testimony would be inadmissible on that basis.

(internal quotation marks omitted)).   Put differently, I cannot say on these motions for summary judgment that the testimony would be inadmissible at trial.[12]   For that reason, Plaintiffs may rely on Decedent's testimony in opposing Defendants' motions for summary judgment, the relevant portions of which I turn to now.

Over the course of his deposition, Decedent testified as to his work, in the United States and overseas, on the F-4E, including having worked on the J79 engine.   For example, Decedent testified that he used a dry rag to wipe down dust in the "engine compartment shields" while on the flight line (*i.e.*, not in the hangar).   Decedent Dep., Vol. 1, T44:17-T45:20.   Beyond this, Decedent testified that the amount of work he performed in connection with the engine compartment was "not much," and primarily limited to "dropping panels and getting the engine ready for the engine shop work."   *Id.* at T52:13-24; *see also id.* at T53:5-12 (describing "dropping panels" as loosening covering panels so that the engine shop could "get inside there and work on those parts that might be underneath there").   In that connection, Decedent testified that he believed he was possibly exposed to asbestos-laden dust from the engine compartment, which blew out whenever he had to drop the engine compartment door. Decedent Dep. Vol. 3, T146:3-T148:4; *see also id.* at T148:13-19, T150:10-T151:20 (explaining belief that engine compartment seals contained asbestos that would generate dust, based on assumption that "made sense to him" and not anything written or imprinted on seals); *id.* at

---

[12]     Alternatively, although not argued by Plaintiffs, I note further that Decedent's deposition testimony could also potentially fall within Fed. R. Evid. 807, the residual hearsay exception. In determining admissibility under Rule 807, courts consider such factors that include, *inter alia*, whether the deponent was available for questioning, and was questioned, by opposing counsel, as well as other circumstances that provide a requisite indicia of reliability required for admissibility.   *See, e.g.*, *Brown ex rel. Estate of Brown v. Philip Morris Inc.*, 228 F. Supp. 2d 506, 512 (D.N.J. 2002).   Thus, I further cannot say on these summary judgment motions that Decedent's testimony would not also be admissible under the residual exception to hearsay in Rule 807, to preclude it from being considered at this juncture.

T173:11-19 (responding affirmatively to question that Decedent believed he had been exposed to asbestos on F-4E "in connection with brake work and exposure to the engine compartment").

On the other hand, Decedent also testified that he primarily had performed "routine maintenance" on the F-4E, which he described as having "inspected it, did maintenance on it, fueled it, put oxygen in it for the pilots, assisted the pilots when getting ready to fly, and when they were done with their mission."   Decedent Dep., Vol. 1, T24:1-10; *see also id.* at T54:13-25 (describing his work on the F-4E as primarily "inspection work").   In that connection, Decedent testified: "I didn't change many seals . . . but I have changed seals, I have changed brakes.   I haven't done much engine work either, but there was an engine specialty shop."   Decedent Dep., Vol. 1, T35:17-22; *see also id.* at T39:17-21 (Q: "Where were the seals [you mentioned earlier] located on the aircraft?" A: "Hydraulics, electrical, any places where there were [*sic*] liquid oxygen.   That's about all I can recall at this point."); *id.* at T40:10-T42:2 (describing replacing seals around the fuel line without describing further where such seals or fuel line would be located); *id.* at T56:12-17 (responding "not sure" and "don't recall" when asked if he knew who made the seals he took out and put in as part of his maintenance work).   Decedent described that the monthly and bimonthly maintenance on the F-4E was performed by the individuals other than himself in a "specialty shop," which included, *inter alia*, "[c]hecking gaskets and seals more . . . that they were in good condition, good working condition."   *Id.* at T31:8-23.

These statements, taken together, raise a genuine issue of fact that Decedent worked on or around the engine on the F-4E.[13]   Nevertheless, the testimony further reveals that Decedent had

---

[13]   From the facts and arguments asserted by Plaintiffs, it is clear that Plaintiffs' claim against GE is premised solely on GE being the manufacturer and supplier of the J79 engine to

no fact-based knowledge that, as a result of contact with the J79 engine and dust from the engine compartment, he was exposed to any asbestos-containing parts or friable asbestos from any such parts.   Rather, Decedent testified as to the basis for believing he had come into contact with asbestos from the J79 engine as follows: "I believe so . . . . My friends at the present time have said there's been asbestos in the aircraft compartments that I worked on sometimes.   I won't say all the time, but sometimes that I was supposed to have been exposed to."   Decedent Dep., Vol. 2, T71:19-24; *see also id.* at T72:6-T73:1 (describing that sole basis for belief of being exposed to asbestos is from what other individuals had told Decedent, at some point between 1970 and the present); Decedent Dep., Vol. 3, T151:7-19 (Q: "[Y]ou said that there was something in this [engine seal] component that appeared to be like a fiberglass." A: "Uh-huh. I believe that to be asbestos, sir." Q: "Okay.   Why is it that you believe that to be asbestos?" A: "Because it was the thickest part of that seal-like component that *I just assumed would have been the asbestos; I assumed it*, sir." Q: "Okay.   And what was the basis for your assumption?" A: "*Just that it made sense to me.*" (Emphasis added.)).   Thus, although Decedent's testimony may raise an issue of fact as to his work on the J79 engine, his testimony, alone, is insufficient to raise an

---

the F-4E, and not based on any other potentially asbestos-containing component of the F-4E.   I limit my analysis accordingly.

     More importantly, Plaintiffs raise no argument, and asserts no facts in dispute, with respect to the engine on the T-38 aircraft or any of its component parts.   Indeed, Plaintiffs do not mention the T-38 even once anywhere in their opposition papers or L. Rule 56.1 statement of undisputed material facts.   In that connection, I note that in his deposition, Decedent testified that he did not believe he had been exposed to asbestos from having worked on the T-38. Decedent Dep., Vol. 3, T188:21-24.   Accordingly, I determine that Plaintiffs have abandoned any claim arising out of Decedent's work on the T-38.   *See Desyatnik v. Atlantic Casting & Eng'g Corp.*, Civ. No. 03-cv5441, 2006 WL 120163 at * 1 (D.N.J. Jan. 17, 2006) ("[W]hen a party fails 'to offer any argument or evidence . . . in opposition to defendants' motion for summary judgement [*sic*], such claims may be deemed to have been abandoned.'" (Quoting *Curtis v. Treloar*, Civ. No. 96-cv-1239, 1998 WL 1110448 (D.N.J. Aug, 27, 1998))); *Marjac, LLC v. Trenk*, Civ. No. 06-1440 JAG, 2006 WL 3751395, at *5 n.3 (D.N.J. Dec. 19, 2006).

issue of fact regarding whether he was exposed to any asbestos-containing part, let alone any friable asbestos, from the J79 or other GE manufactured or supplied component.

Notwithstanding the lack of facts in Decedent's deposition testimony specifically connecting Decedent to work on asbestos-containing parts or exposure to asbestos-containing dust from the J79, Plaintiffs rely on the deposition testimony of Frank Deaver, and the expert reports of (i) Dr. Arthur L. Frank, as an expert on medical causation, (ii) Steven Paskal, as a certified industrial hygienist, and (iii) Mark A. Thompson, as an aviation expert.   According to Plaintiffs, this evidence sufficiently raises genuine dispute over whether Decedent was exposed to asbestos from GE manufactured or supplied products due to his work on the J79 engine.

Plaintiffs' reliance on Mr. Deaver's testimony is unavailing because he supplied no testimony that he ever observed Decedent working on the J79 engine—including work on changing sleeves or gaskets—or that he had any reason to believe that Decedent would have engaged in such work, let alone that work on the engine performed by a crew chief like Decedent would have exposed him to asbestos from components in or around the engine.   To the contrary, Mr. Deaver testified that it was not within the responsibilities of someone in Decedent's position to work on, or to oversee work on, the J79 engine on the F-4E.   Indeed, it is undisputed by Plaintiffs that Mr. Deaver (i) never observed Decedent working on or around the engines of an F-4E, and (ii) could not identify any instance in which he observed Decedent come into direct contract with a GE product, including any gaskets or clamps, associated with the J-79 engine.   GE Facts, ¶¶ 12-15; Pl. Resp. to GE Facts, ¶¶ 12-15.   At best, Mr. Deaver's testimony merely speculates that Decedent could have worked on or around the J79 engine; however, such speculation is insufficient to create a genuine issue of fact necessary to defeat a motion for

summary judgment.  *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 252 (3d Cir. 1999) (stating that speculation and conclusory allegations are insufficient to forestall summary judgment). Accordingly, Plaintiffs cannot overcome GE's summary judgment motion by relying on Mr. Deaver's testimony to demonstrate the requisite causal link.

With respect to Plaintiffs' reliance on the three proffered experts, the only relevant opinions connecting Decedent to the J79 engine are those of Mark A. Thompson.[14]  Mr. Thompson describes himself as an expert "in the area of aircraft, the component parts of aircraft, the aircraft component parts [*sic*] and the normal duties of aircraft maintenance mechanics."[15] Pl. Opp. to GE Mot., Ex. F (hereinafter "Thompson Report"), ¶ 5.   In his report, Mr. Thompson explained that "based on reading the deposition of Mr. Brasmer . . . I have been able to identify that Mr. Brasmer had direct contact, either through engine or brake work, with the . . . F-4E." *Id.* at ¶ 6. Mr. Thompson further noted that the F-4E engine was the J79, a fact which is also not disputed by the parties.   *Id.* at ¶ 8.   The core of Mr. Thompson's report, as it pertains to GE, is the following conclusion:

> [The J79] engine contained numerous gaskets and clamps that were asbestos containing.   Additionally, Gene Davis, General Electric's PMQ, testified in another case that "they used fire shielding on just about all flexible hosing on these engines."   Many of the fire shields, also known as fire sleeves, incorporated asbestos into the finished product.   It is my opinion that Mr. Brasmer would have been exposed to asbestos based on the work he was performing around the F-4E.

---

[14]    Mr. Thompson also connects Decedent to the engine used in the T-38, a J85-GE-5 ("J85"), also manufactured by GE.   As noted *supra*, Footnote 13, Plaintiffs' claim against GE is based solely on his exposure to the J79 engine, and thus I do not address Mr. Thompson's report with respect to the J85 engine.

[15]    Neither GE, nor any other Defendant, has moved on the admissibility under *Daubert* of Mr. Thompson's opinions in his report, and thus I make no determination in that regard on this summary judgment motion.   *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 592 (1993).

*Id.* Plaintiffs also point to Mr. Thompson's other opinions, which state that "some of the components in the [F-4E] contained asbestos during the time period at issue," and describe how repair work "inside the engine compartment" would result in exposing those asbestos-containing components, and would cause asbestos to be released into the engine space and the ambient air.[16] *Id.* at ¶ 11. Relying on this expert opinion, Plaintiffs contend that they have sufficiently raised a genuine issue as to whether an asbestos-containing GE component caused Decedent's injuries.

In New Jersey, proof of causation is a requisite element for establishing any product-liability action. *Coffman v. Keene Corp.*, 133 N.J. 581, 594 (1993). New Jersey courts apply a specific causation standard for products-liability cases arising out of asbestos exposure. In *Sholtis v. American Cyanamid Co.*, 238 N.J. Super. 8, 28-29 (App. Div. 1989), the Appellate Division adopted the "frequency, regularity and proximity" test for asbestos cases, meaning that a plaintiff alleging injury from an asbestos-containing product can only establish causation by showing that he or she was exposed to asbestos frequently, regularly, and proximately. Subsequent to *Sholtis*, the Appellate Division explained that in mesothelioma cases, such as here, a plaintiff can prove causation by proving that exposure to asbestos was a "substantial factor" in causing mesothelioma. *Kurak v. A.P. Green*, 298 N.J. Super. 304, 321-22 (App. Div. 1997). Contrary to Plaintiffs' suggestion, nothing in *Kurak* overrules *Sholtis*' "frequency, regularity and proximity" test. Rather, *Kurak* suggests, at most, that in mesothelioma cases, the frequency, regularity, and proximity of asbestos exposure can be demonstrated on a lesser showing of proof. *See id.* at 321-22. Indeed, New Jersey courts continue to rely on the *Sholtis* standard. *See, e.g., James v. Chevron U.S.A., Inc.*, 301 N.J. Super. 512, 528-29, 694 A.2d

---

[16] In that connection, it should be noted that, in forming his conclusion regarding Decedent's exposure to asbestos related to the F-4E engine, Mr. Thompson relied entirely on Decedent's deposition testimony.

270, 278 (App. Div. 1997) ("A plaintiff's satisfaction of this 'frequency, regularity, and proximity' test serves to demonstrate that the plaintiff was more than just casually or minimally exposed to a defendant's toxic product.") *aff'd and remanded sub nom. James v. Bessemer Processing Co., Inc.*, 155 N.J. 279 (1998) (citing *Sholtis*, 238 N.J. Super. at 28-29).   Furthermore, in recently reaffirming the *Sholtis* standard, the Appellate Division emphasized that it is not enough for a plaintiff to "survive summary judgment by showing [her or she] had sufficient contact with [defendant's product] without regard to what component parts that allegedly caused [plaintiff's] injuries."  *Hughes v. A.W. Chesterton, Co.*, __ A.3d __, __, 2014 WL 1613394, at *8 (N.J. App. Div. 2014).   Rather, to prove causation in asbestos cases, a plaintiff must show both (i) exposure to a product manufactured or supplied by the defendant, *and* (ii) exposure to an injury-producing element—*i.e.*, the asbestos-containing component that generated friable asbestos—in the product that was also manufactured or sold by the defendant.  *Id.*  Thus, in order to prove causation, Plaintiffs must prove that Decedent was frequently, regularly and proximately exposed to an asbestos-containing component in a GE manufactured or supplied product, and that such exposure was at least a substantial factor in causing Decedent's mesothelioma.

Here, Plaintiffs have failed to identify facts that show Decedent's frequent, regular, and proximate exposure to any specific asbestos-containing product in the J79 engine, or in any other component of the F-4E supplied or manufactured by GE product.   Decedent's testimony at most shows that he may have been frequently and regularly exposed to dust from the engine compartment, which dust could have been caused by a gasket or seal, and that this gasket or seal could have contained asbestos—such as the seal that Decedent testified that he believed, without any other evidentiary foundation, contained asbestos.   Notably, Decedent never testified that he

27

could have been exposed to asbestos from the J79 because he actually changed or handled the engine gaskets or seals; Plaintiffs' entire exposure theory against GE is centered on dust that was present in the engine compartment.   Decedent's testimony is insufficient to create a genuine dispute regarding Decedent's exposure to asbestos from a GE component on the F-4E.   In order for a jury to find that Decedent's injury was caused by a GE component, they would have to infer that the dust in the engine compartment was from gaskets or seals that contained asbestos, which were also manufactured or supplied by GE.   This inferential connection between Decedent's alleged asbestos exposure and GE is too tenuous to defeat summary judgment, as it would ultimately require the jury to engage in speculation in order to find the requisite casual chain.   *See Robertson*, 914 F.2d at 383 n.12 (stating that "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment").

The only other relevant evidence Plaintiffs rely upon to defeat GE's summary judgment motion is the opinion found in the expert report of Mr. Thompson.[17]   As noted, Mr. Thompson opines that Decedent would have been exposed to asbestos-containing while working in the F-4E engine compartment.   Mr. Thompson's report does not state which specific components would have contained asbestos, but rather describes how working in the engine compartment "required

---

[17]     Plaintiffs also argue that "Plaintiff's expert in medicine and asbestos-related diseases has offered an expert opinion that . . . [Mr. Brasmer's] exposures through work with gaskets are 'significant' exposures that contributed to Mr. Brasmer's death from mesothelioma."   Pl. Opp. to GE Mot., 11.   Plaintiffs misconstrue the relevance of this expert's opinion, which was based on Decedent's self-reported belief that he had worked on gaskets that contained asbestos.   *See* Pl. Opp. to GE Mot., Ex. D (Report of Dr. Arthur L. Frank).   Moreover, this expert does not purport to be knowledgeable about whether such gaskets would or would not contain asbestos; the expert merely offered a medical diagnosis based on Decedent's own complaint, which is unsubstantiated by the record and thus insufficient to serve as a basis to defeat summary judgment.   *See New Jersey Tpk. Auth. v. PPG Indus., Inc.*, 197 F.3d at 112 (citing *Anderson*, 477 U.S. at 249-50) (explaining that expert opinions that are not sufficiently probative of issue cannot be used to defeat summary judgment).

28

the manipulation of exposed [asbestos-containing] components."   Thompson Report, ¶ 11.   In that connection, Mr. Thompson describes how "repair work inside the engine compartment, including, but not limited to, removing, installing, or repairing engine component [*sic*] and including such regular tasks as replacing gaskets, engine inspections, checking fuel filters, oil leaks, exhaust leaks, and electrical connections, along with other minor repairs, required manipulation of the exposed [asbestos-containing] components."   Thompson Report, ¶ 11. However, this portion of Mr. Thompson's opinion—regarding the specific areas of the engine on which Decedent would have worked—cannot be used to defeat summary judgment because it is not based on any facts in the record.   "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."   *Brooke Group Ltd. v. Brown & Williamson Tobacco*, 509 U.S. 209, 242 (1993).   Here, Decedent never testified with specificity regarding his work on the J79; the only work Decedent explained with certainty was using rags to wipe out the engine compartment, and loosening access panels on or around the engine.   Thus, Mr. Thompson's opinion relating to Decedent's exposure from any other work related to the J79 is not based upon the record and thus cannot defeat.   *Martin v. Unknown U.S. Marshals*, 965 F. Supp. 2d at 529 ("[C]ourts grant summary judgment when the expert relied upon by the party opposing the motion does not rely on sufficient facts to support his opinion."); *see also Brooke Group Ltd.*, *supra*.

In any event, nowhere does Mr. Thompson explain which of these parts in the engine would have been comprised of asbestos-containing components; rather he generically states that "some of the of the [F-4E] aircraft contained asbestos" and "[s]ome of the insulation blankets

used on jet-engine cones and tail pipes contained phenolic." Thompson Report, ¶ 11.   This vague, conclusory opinion—regarding Decedent's exposure based on the theory that some of the engine components that Decedent might have worked on contained asbestos—cannot on its own defeat summary judgment.   *See New Jersey Tpk. Auth. v. PPG Indus., Inc.*, 197 F.3d 96, 112 (3d Cir. 1999) (citing *Anderson*, 477 U.S. at 249-50).   Similarly, Mr. Thompson's opinion that some F-4E's used asbestos-containing fire shielding is not sufficient to connect Decedent's injury to exposure from those fire shields.   Nothing in Mr. Thompson's report states that the aircraft Decedent worked on would have contained such shielding, or that even if they did, the dust Decedent was exposed to came from that shielding.

Even giving Plaintiffs the benefit of all reasonable inferences from Mr. Thompson's report, his opinion is deficient in several respects: it is vague and imprecise, of questionable reliability, and therefore not sufficiently probative to create an issue for trial.   *See Anderson*, 477 U.S. at 249-50 (stating that summary judgment may be granted if evidence is "merely colorable" or is "not significantly probative").   There are simply too many inferences and leaps of logic that must be made in order to find, based on Mr. Thompson's report, that Decedent was exposed to friable asbestos from a GE-supplied asbestos-containing product for Plaintiffs to defeat GE's motion for summary judgment.   *See Robertson*, 914 F.2d at 383 n.12 (stating that "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment").

In sum, although Plaintiffs are correct that in mesothelioma cases, usually any exposure to asbestos-containing products will satisfy the "proximate, regular, and frequent" test, here there is simply not enough evidence to show that Decedent was actually exposed to *any*

asbestos-containing products manufactured or supplied by GE.   Neither Decedent nor Mr. Deaver provides any deposition testimony connecting Decedent's asbestos exposure to a GE component in or around the J79 engine.   Further Mr. Thompson's report, at most, opines that, in working on F-4E engine components, Decedent may have worked in the area of some, possibly exposed, asbestos-containing components—an opinion that is too speculative on its own to defeat summary judgment.   Because Plaintiffs point to no other evidence on this issue, I find that Plaintiffs have failed to establish that a jury could find GE caused Decedent's injury, and thus summary judgment is granted in GE's favor.

### C.  Goodyear's Motion

Goodyear moves for summary judgment on the same grounds as GE, *i.e.*, that Plaintiffs have failed to establish that Decedent came into contact with any asbestos-containing component manufactured or supplied by Goodyear, and that Plaintiffs have failed to establish that Decedent had regular, frequent, and proximate exposure to any asbestos-containing product during his military service.   As before, Plaintiffs oppose Goodyear's motion by relying primarily on the deposition testimony of Decedent and Mr. Deaver, as well as the expert report of Mr. Thompson.

In support of its motion, Goodyear cites the absence of any evidence supplied by Plaintiffs to support their claim against Goodyear, as well as the declaration of its corporate representative, Harold Robert Booher, who stated that (i) a Goodyear brake originally certified for use of the F-4E did not contain any asbestos-containing friction components, but only an enclosed asbestos insulator, and (ii) this asbestos-containing model was replaced in 1970 with an all-metal, non-asbestos model.   *See* Goodyear Mot., Decl. of Harold Robert Booher, ¶¶ 11, 14. On these facts, Goodyear contends that Plaintiffs have failed to raise a genuine dispute showing

that Decedent was ever exposed to any Goodyear product that contained asbestos on a frequent, regular, and proximate basis.[18]

With respect to their claim against Goodyear, Plaintiffs contend that the record evidence establishes that Decedent was exposed to a large amount of dust during his work on the F-4E, which primarily came from the area in and around the F-4E's brakes.[19]   According to Plaintiffs, this dust contained asbestos because (i) Decedent and Mr. Deaver testified that they believed the dust to be asbestos-laden, (ii) a technical manual pertaining to the F-4E shows that a Goodyear-supplied brake assembly contained an asbestos insulator, and (iii) Mr. Thompson opined that Decedent's work in and around the F-4E brake assembly would have exposed him to asbestos-laden dust.[20]   I address each of these averments in turn.

Plaintiffs' reliance on Decedent and Mr. Deaver's deposition testimony to defeat Goodyear's summary judgment motion is misplaced.   As the following makes clear, neither Decedent nor Mr. Deaver provided any testimony establishing that Decedent worked on or was exposed to asbestos-laden dust from any Goodyear manufactured or supplied component.

Decedent testified during deposition to being exposed to large amounts of dust in connection with work on the F-4E's brake assembly, which he personally believed to have

---

[18]     The same *Sholtis-Kurak* causation test identified in connection with GE's summary judgment motion applies to Plaintiffs' claims against Goodyear.

[19]     As with Plaintiffs' opposition to GE's motion, Plaintiffs make no claim as to Decedent's exposure to any asbestos-containing product supplied or manufactured by Goodyear on the T-38 aircraft.   For the same reasons as stated in connection with GE's motion, I determine that Plaintiffs have waived any claim arising out of Decedent's work on the T-38.   *See supra*, Footnote 14.

[20]     Again, to the extent that Plaintiffs also rely on the reports of their other experts, such reliance is unavailing.   These experts' opinions are not submitted to show how it may have been possible for Decedent to have been exposed to asbestos; indeed, review of these experts' reports sheds no light on whether Decedent was exposed to asbestos as a result of Goodyear products. *See supra*, Footnote 17 (noting that Plaintiffs' medical causation expert report not sufficiently probative on the issue of what asbestos-containing products Decedent may have been exposed to).

contained asbestos.   Decedent Dep. Vol. 3, T128:14-T181:13 (testifying that he was exposed to dust from the brake assemblies and that he believed, without explaining why, that this dust contained asbestos).   Specifically, during the first day of deposition, Decedent testified to having been exposed to asbestos-laden dust from the "brake filter," largely from having using compressed air to blow out this component and the brake assembly/compartment.   *See, e.g.*, Decedent Dep., Vol. 1, T44:12-16.   On the second day of deposition, Decedent explicitly retracted this statement, explaining that "I don't recall brake filters today . . . . If there were, I don't know where they would have been in there because in my mind, the dust that was produced by the brake might have been too heavy to blow off of them, the material used to make the rotors and stators would have been too heavy to just blow off with compressed air."   Decedent Dep., Vol. 2, T84:1-8.   Although not addressed by the parties in their summary judgment motions, from the limited record preserved by the deposition transcript, it appears that Decedent's self-impeaching testimony from the second day of deposition was the result of having taken narcotic-based pain killers.   *See supra*, Footnote 11.   On the third, and final, day of deposition, and not under the influence of any narcotics, Decedent testified that he was exposed to dust from blowing off "[j]ust the stators" on the F-4E.   Decedent Dep., Vol. 3, T130:25-T131:9.   In that connection, I note that Mr. Deaver testified substantially to the same effect.   *See, e.g.*, Pl. Opp. to Goodyear Mot., Ex. C (Deaver Dep.) T42:22-T43:15, T54:7-55:4 (explaining that dust was present in F-4E brake compartment, and that his work on brakes was composed of replacing the stators and rotors).   In light of the relative consistency of this aspect of Decedent's testimony, and the fact that Defendants have not challenged the admissibility of Decedent's testimony on competency grounds, I find that Plaintiffs have raised a genuine issue as to whether Decedent

was exposed to dust from using compressed air to blow off the brake stators on the F-4E.   *See also id.* at T144:15-19 (expressing belief that dust came only from stators and rotors, and not "anything internal").

Nevertheless, like with GE, Decedent's own basis for believing that he was exposed to asbestos from the F-4E brake rotors and stators is entirely subjective.   Decedent testified that he never personally observed anything on or related to the F-4E brake components that would indicate that any of the components contained asbestos; instead, his conclusion was based on having been told by an USAF assistant crew chief that the stators contained asbestos.   *See* Decedent Dep., Vol. 3, T154:19-T157:8.[21]   Plaintiffs rely on other evidence that they contend raises a genuine issue of material fact regarding Decedent's exposure to Goodyear components, sufficient to defeat summary judgment.   First, Plaintiffs point to a technical manual for the F-4E, which, Plaintiffs argue, shows that an asbestos-containing Goodyear component was used in the F-4E brake assembly; in that connection, Plaintiffs further rely on a declaration from Goodyear's own corporate representative stating that a Goodyear brake assembly certified for use in the F-4E contained an asbestos insulating ring.   Plaintiffs also rely on the report of their expert, Mr. Thompson, to connect Decedent to asbestos from Goodyear components.   I address each of these contentions in turn.

The "technical manual" submitted by Plaintiffs is incomplete; it is comprised of several introductory pages of computer-typed/generated notations, and three pages of what appears to be a copy of an excerpt of a manual relating to parts for a "Hydraulic Brake for 30x11.50—14.5 Main Wheel."   *See* Pl. Opp. to Goodyear Mot., Ex. A.   On its face, nothing from the technical manual portion of the exhibit connects this brake assembly to the F-4E let alone the F-4E for the

---

[21]   Similarly, nothing in Mr. Deaver's testimony establishes that any of the dust Decedent was exposed to contained asbestos from a Goodyear manufactured or supplied component.

34

time period relevant to Decedent's alleged asbestos exposure.[22]   Similarly, nothing from this portion of the exhibit establishes that the brake assembly contained asbestos.   *See id.*   Instead, Plaintiffs rely on annotations to the manual—arising apparently from comments supplied Plaintiffs' expert, Mr. Thompson—noting that an "alternate" insulator piece identified in the manual contained asbestos.   *See id.*   In other words, Plaintiffs rely not on the contents of the manual itself, but on notations from some unidentified individual, to defeat summary judgment.[23]   These additional annotations are not sworn to or otherwise attested to, either by counsel for Plaintiffs or any of Plaintiffs' experts, such as Mr. Thompson, and thus, on that basis alone, the exhibit may not be relied on to defeat summary judgment.   *See* Fed. R. Civ. P. 56(c)(4) (requiring declaration to defeat summary judgment be based on personal knowledge and sworn or otherwise attested to); *see also Fowle v. C & C Cola, a Div. of ITT-Cont'l Baking Co.*, 868 F.2d 59, 67 (3d Cir. 1989) ("The substance of this report was not sworn to by the alleged expert. Therefore, the purported expert's report is not competent to be considered on a motion for summary judgment." (Citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158 n.17 (1970))).[24]

---

[22]     There is a handwritten notation "F-4" on the front page of the copied manual; nothing indicates who wrote this.   As noted above, as best this Court can determine, the handwriting might be that of Mr. Thompson, and thus provides little guidance in ascertaining the import of this exhibit.   Similarly, although the manual contains the date "1 December 1969", it is unclear what timespan the manual is meant to cover and remain valid.

[23]     Alternatively, these notes may have been drafted by Plaintiffs' counsel.   In that case, they would be similarly insufficient to defeat summary judgment, as Plaintiff's counsel has not sworn that he has personal knowledge of the F-4E brake components.

[24]     *Fowle* and *Adickes* relied on a former version of the Federal Rules, Rule 56(e), which required, in effect, that any expert submission be accompanied by a sworn statement.   Revised Rule 56(c)(4), as amended in 2010, replaces former Rule 56(e), and eliminates the explicit sworn statement requirement of former Rule 56(e).   *See* Fed. R. Civ. P. 56, Commentary to 2010 Rev. Nevertheless, although "[a] formal affidavit is no longer required," Rule 56(c)(4) still requires "a written unsworn declaration, certificate, verification, or statement subscribed in proper form as true under penalty of perjury to substitute for an affidavit."   *Id.*   Here, the notes accompanying the technical manual are neither sworn to, nor accompanied by any subscription that the notes are submitted under penalty of perjury, and thus, under either former Rule 56(e) or current Rule

Moreover, even if it were appropriate to rely these annotations to the technical manual in ruling on Goodyear's summary judgment motion, these notes establish at most that an *alternate* configuration for the Goodyear-supplied brake assembly of the F-4E contained an asbestos insulator at some point in 1969.   *See* Pl. Opp. to Goodyear Mot., Ex. A.   Plaintiffs do not provide anything showing that (i) the F-4E aircraft on which Decedent worked contained this alternate brake configuration, or (ii) that the insulator component would ever become exposed and/or generate friable asbestos.   Indeed, Plaintiffs provide nothing to contradict the declaration of Goodyear's corporate representative who stated that that the insulator "is not subject to any friction or wear," and that during removal of the brake assembly, the insulator would "remain in place between the brake piston and the first non-rotating disc."   Goodyear Mot., Decl. of Harold Robert Booher, ¶¶ 12, 14.   Simply put, Plaintiffs have offered no evidence that Decedent was exposed to this particular, alternate, version of the Goodyear brake assembly, and thus no evidence that he was exposed to any asbestos—including asbestos-laden dust—from this Goodyear component.   Moreover, Plaintiffs have not offered anything showing that the Goodyear brake assembly contained other asbestos-containing components.   Because, on this evidence, the jury would have to engage in pure speculation in order to conclude that Decedent had regular, frequent, and proximate exposure to asbestos from a Goodyear product, Plaintiffs' reliance on such evidence is insufficient to defeat summary.   *Ridgewood Bd. of Educ.*, 172 F.3d at 252.

---

56(c)(4), the exhibit cannot be considered to defeat summary judgment.   *Accord Wodarczyk v. Soft Pretzel Franchise Sys., Inc.*, Civ. No. 12-CV-3874, 2013 WL 5429299, at *4 (E.D. Pa. Sept. 30, 2013) ("The Third Circuit has construed former Fed. R. Civ. P. 56(e), now codified at Fed. R. Civ. P. 56(c)(4) after the 2010 Amendments, to require that expert reports be sworn. . . .   As in *Fowle*, Defendants' expert report is not sworn.   The Court therefore cannot consider it on a motion for summary judgment." (Citation omitted.) (Citing *Fowle*, 868 F.2d at 67)).

Finally, Plaintiffs' contention that Mr. Thompson's opinions contained in his report raise a genuine issue of fact as to whether Decedent was exposed to asbestos from a Goodyear product is without merit.   Review of Mr. Thompson's report reveals that he offers no explicit opinion on whether Decedent was exposed to asbestos from a Goodyear product on the F-4E.   Although Mr. Thompson generally opines that "Mr. Brasmer would have been exposed to asbestos based on the work he was performing around the F-4E aircraft," Thompson Report, ¶ 8, nowhere in his report does Mr. Thompson identify how working with the brakes on the F-4E would have exposed Decedent to asbestos.   All that Mr. Thompson offers by way of opinion regarding the brakes is the fact that Decedent would have come into contact with braking components while working on the F-4E.   Mr. Thompson's general opinion regarding Decedent's exposure is far too vague, and not sufficiently probative, on the issue of whether Decedent was exposed to asbestos from a Goodyear product, and thus Plaintiffs cannot rely on Mr. Thompson's report to defeat summary judgment.   *See New Jersey Tpk. Auth. v. PPG Indus., Inc.*, 197 F.3d at 112 (citing *Anderson*, 477 U.S. at 249-50).

In sum, Goodyear has established a lack of record evidence supporting Plaintiffs' claim that Decedent ever came into contact with any asbestos-containing Goodyear product, or that Decedent had regular, frequent, and proximate exposure to asbestos from a Goodyear product. Accordingly, summary judgment will be granted in Goodyear's favor.

**CONCLUSION**

In conclusion, Boeing has shown its entitlement to the government contractor defense, and Plaintiffs have failed to identify any material facts precluding summary judgment on their

claims against GE and Goodyear.   Accordingly, these Defendants' motions for summary judgment on all counts of the TAC are granted.


Date: June 19, 2014                                   /s/ Freda L. Wolfson
                                                      The Honorable Freda L. Wolfson
                                                      United States District Judge